UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

GREGORY LOWRY,                           )
                                         )
                    Plaintiff,           )
                                         )
        v.                               )        No.  1:13CV145 TIA
                                         )
CAROLYN W. COLVIN, Acting                )
Commissioner of Social Security,         )
                                         )
                    Defendant.           )

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of the

Commissioner's final decision denying Gregory Lowry's application for disability

insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401, *et

seq.*  All matters are pending before the undersigned United States Magistrate

Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).  Because the

Commissioner's final decision is not supported by substantial evidence on the

record as a whole, it is reversed.

## I.  Procedural History

In December 1998, an administrative law judge (ALJ) with the Social

Security Administration (SSA) found plaintiff to be disabled and entitled to

disability insurance benefits (DIB) as of May 21, 1997, because of the effects of

his severe impairments:  chronic hepatitis C and seizure disorder.  The ALJ noted the record to show that plaintiff began experiencing seizures in July 1997, which was within two months of sustaining a head injury from a motorcycle accident. (Tr. 195-203.)  In January 2008, the SSA determined plaintiff's disability to have ceased as of January 15, 2008, due to medical improvement.  (Tr. 209, 228-31.)

Plaintiff reapplied for DIB on August 20, 2010, claiming that he became disabled on January 1, 2009, because of head injury and complications from the motorcycle accident.  (Tr. 311-17, 388.)  On December 20, 2010, the SSA denied plaintiff's claim for benefits.  (Tr. 210-11, 235-39.)  Upon plaintiff's request, a hearing was held before an ALJ on November 14, 2011, at which plaintiff, his friend, and a vocational expert testified.  (Tr. 698-740.)  A supplemental hearing was held on July 11, 2012, at which plaintiff, a medical expert, and a vocational expert testified.  (Tr. 741-70.)  On August 2, 2012, the ALJ issued a decision denying plaintiff's claim for benefits finding that plaintiff could perform his past relevant work as a security guard and, alternatively, could perform other work as it exists in significant numbers in the national economy.  (Tr. 21-31.)  On August 3, 2013, the Appeals Council denied plaintiff's request for review of the ALJ's decision.  (Tr. 7-11.)  The ALJ's determination thus stands as the final decision of the Commissioner.  42 U.S.C. § 405(g).

In the instant action for judicial review, plaintiff claims that the ALJ's

decision is not supported by substantial evidence on the record as a whole. Plaintiff specifically argues that the ALJ failed to undergo the required analysis when determining whether he suffered a severe mental impairment and thus erred in finding that his mental impairment was not severe. Plaintiff also contends that the ALJ's residual functional capacity (RFC) assessment is flawed inasmuch as the ALJ failed to include limitations associated with his severe impairment of essential tremor. Plaintiff requests that the final decision be reversed and that the matter be remanded for further consideration. For the reasons that follow, the matter will be remanded for further proceedings.

## II. Testimonial Evidence Before the ALJ

A.     Hearing Held on November 14, 2011

      1.     *Plaintiff's Testimony*

At the hearing on November 14, 2011, plaintiff testified in response to questions posed by the ALJ and counsel.

At the time of the hearing, plaintiff was fifty-two years of age. Plaintiff is divorced. He has five children ranging in age from seventeen to twenty-six years. Plaintiff lives with his ex-wife's brother in a basement apartment. (Tr. 704-05.) Plaintiff has a business degree from Metro Business College. He has no income and no insurance but receives food stamps. Plaintiff previously received unemployment benefits, having last received them two to three years prior to the

hearing.  (Tr. 706-07.)

Plaintiff's Work History Report shows that plaintiff worked as a concrete worker from 2005 to 2007.  In 2007, plaintiff also worked as a line worker in a factory.  In 2008, plaintiff was a trainer in the teleservice industry.  In 2008 and 2009, plaintiff again worked as a line worker in a factory.  Plaintiff worked as a security guard at a university for one event in 2009.  In 2010, plaintiff worked again as a line worker.  (Tr. 410, 710.)  Plaintiff testified that he left this work because of seizures.  Plaintiff testified that throughout this employment history, he applied for and found work but was unable to keep jobs because of recurring seizures.  (Tr. 708.)

Plaintiff testified that he was involved in a motorcycle accident many years ago and injured his head.  Plaintiff was in the hospital for three weeks after the accident and began to experience seizures thereafter.  (Tr. 719.)  Plaintiff takes medication for his seizures, but they are not yet controlled.  Plaintiff testified that his friend, Annie, manages the medication for him.  (Tr. 716.)  Plaintiff testified that his doctor has advised him not to climb ladders or go near water and that he must avoid bathing unattended and avoid driving for six months after experiencing a seizure.  Plaintiff has not driven since 2009 or 2010.  (Tr. 722.)  Plaintiff testified that his most recent seizure occurred the previous day, and that he had a grand mal seizure about one and a half weeks prior.  (Tr. 716.)

Plaintiff testified that he has grand mal seizures every one to two months that cause him to shake violently and bite his tongue. Plaintiff testified that he is "completely out" during these episodes. The seizures last about twenty to thirty minutes and it takes plaintiff three to four days to recover because of the resulting muscle fatigue. (Tr. 724.) Plaintiff testified that he also has milder seizures that cause him to stare into space for about fifteen to twenty minutes. Plaintiff is not aware of his surroundings during these episodes. Plaintiff testified that he is tremendously limited because of the unpredictable nature of his seizures. (Tr. 725-26.) Plaintiff testified that he had an episode in 2010 during which he experienced a series of seizures and wandered into a park where he then lived for a few weeks until a friend found him. Plaintiff testified that he has no recollection of this event but was told by others of its occurrence. (Tr. 723.)

Plaintiff testified that he also has tremors in his hands and legs for which he takes medication. Plaintiff is able to pick up things, use eating utensils, zip and button his clothes, put on shoes and socks, and use a doorknob, but he has difficulty using a keyboard. (Tr. 717.)

Plaintiff testified that he feels down and has problems with depression. He does not have crying spells. Plaintiff also has anxiety for which he takes Klonopin. Plaintiff testified that he used to have anxiety attacks frequently but that the medication seems to help his condition. Plaintiff also takes Ambien, which helps

him with sleep.  Plaintiff does not see a psychologist, psychiatrist, or counselor for his mental conditions.  (Tr. 718-20.)

Plaintiff testified that his medications constantly make him feel sick to his stomach and that his doctor adjusts his medication to try to help with that effect. (Tr. 718.)  Plaintiff testified that his nausea might also be from hepatitis C, for which he used to take chemotherapy-type medication.  Plaintiff testified that he no longer takes the medication because he does not have the income to get his levels checked.  (Tr. 723-24.)

As to his exertional abilities, plaintiff testified that he has no difficulty sitting.  He can stand for about forty-five minutes.  Plaintiff testified that he could not estimate what distance he could walk inasmuch as he does not walk outside because of the possibility of seizure activity.  Plaintiff has some difficulty climbing steps.  Plaintiff testified that he could probably lift sixty to seventy pounds.  (Tr. 721-22.)

As to his daily activities, plaintiff testified that he gets up in the morning around 9:00 or 9:30 a.m.  Plaintiff then travels to a nursing home where he spends four or five hours visiting with a friend's mother who has had a stroke.  An acquaintance drives him to the nursing home.  (Tr. 711.)  Plaintiff has a driver's license but does not drive because of seizures.  (Tr. 706.)  Plaintiff testified that after returning home, he reads or talks with his children who may come to visit

him.  Plaintiff testified that he must go back and reread things that he already read because of poor concentration and memory.  Plaintiff is able to do housework, such as laundry, changing the sheets on his bed, and loading the dishwasher, but he does not cook or prepare meals because of seizures.  Plaintiff receives help with household chores.  Plaintiff goes grocery shopping but is accompanied by someone.  Plaintiff helps carry the groceries into the house.  Plaintiff testified that he has friends and is social but cannot get around much.  Plaintiff is active in church but does not participate in any clubs, organizations, or volunteer activities. (Tr. 712-13, 720.)  Plaintiff does no yard work and cannot do simple household or car repairs.  Plaintiff testified that he enjoys fishing.  Plaintiff testified that he needs assistance with bathing and must have someone nearby when he showers. Plaintiff cannot take baths because of the risk of drowning.  (Tr. 715.)

    2.    *Testimony of Anne Finnegan*

Anne Finnegan, plaintiff's friend, testified at the hearing in response to questions posed by the ALJ and counsel.

Ms. Finnegan testified that she has known plaintiff for about twenty years and has assisted him with his medical conditions on a daily basis since May 2010, which was when plaintiff was found in the park.  Ms. Finnegan testified that she offered to take plaintiff in at that time to help him because he was so sick.  Ms. Finnegan testified that plaintiff was admitted to the hospital for about a week after

this episode.  Ms. Finnegan helped plaintiff find an apartment, but he was evicted after his disability benefits ended.  (Tr. 727-28.)

Ms. Finnegan testified that she thinks plaintiff's condition has worsened since May 2010 despite his taking medication.  Ms. Finnegan checks on plaintiff every day to be sure he has taken his medication and has eaten.  Ms. Finnegan testified that plaintiff cannot remember on many occasions whether he has eaten. Ms. Finnegan testified that plaintiff has difficulty with his day-to-day memory and sometimes cannot remember things that occurred five minutes ago.  Ms. Finnegan also testified that plaintiff repeats himself multiple times in response to questions she asks him.  (Tr. 730-31.)

Ms. Finnegan testified that she has never witnessed plaintiff having a grand mal seizure but has seen him afterward with bruising on his face.  Ms. Finnegan testified that plaintiff is very lethargic and has diarrhea during the days after having a seizure and that such post-seizure effects may last up to a week.  Ms. Finnegan testified that she thought she witnessed plaintiff have a small seizure the previous day during which time his eyes were dilated and he was acting strange.  (Tr. 729.)

Ms. Finnegan testified that plaintiff does not drive and she does all of his driving for him.  Ms. Finnegan drove plaintiff to the hearing.  (Tr. 729.)

Ms. Finnegan has attended plaintiff's doctors' appointments with him and is aware of the doctors' instruction for plaintiff not to bathe or shower without

anyone present. Ms. Finnegan testified that plaintiff cannot do anything for himself without someone present. Ms. Finnegan has told plaintiff not to walk outside by himself because of not knowing when a seizure will occur. (Tr. 730.)

3. *Testimony of Vocational Expert*

Dr. John McGowan, a vocational expert, testified at the hearing in response to questions posed by the ALJ and counsel.

Dr. McGowan classified plaintiff's past work as a construction worker as very heavy with an SVP level of 2; and machine operator as medium and semi-skilled. The ALJ instructed Dr. McGowan not to consider plaintiff's past work as a security guard inasmuch as plaintiff did not perform the work long enough. Dr. McGowan also determined not to testify regarding plaintiff's past work as a computer trainer inasmuch as the record showed plaintiff to have earned no income from the job. (Tr. 735-36.)

The ALJ asked Dr. McGowan to consider a fifty-two-year-old individual with an education beyond high school and plaintiff's past relevant work. The ALJ asked Dr. McGowan to assume the individual could perform light work defined as lifting, carrying, pushing, and pulling twenty pounds occasionally and ten pounds frequently; and being able to sit, stand, and walk each for six hours out of an eight-hour workday. The ALJ asked Dr. McGowan to further assume that the person could not be exposed to ladders, ropes, scaffolds, moving machinery, or

unprotected heights.  Dr. McGowan testified that such a person could not perform any of plaintiff's past work but could perform other work such as small parts assembler, of which 8,600 such jobs exist in the State of Missouri and 345,000 nationally; and plastic products inspector/hand packager, of which 1,730 such jobs exist in the State of Missouri and 75,650 nationally.  (Tr. 736-37.)

Counsel asked Dr. McGowan to consider the person to have uncontrollable tremors that cause his hands to shake for periods of time.  Dr. McGowan testified that such a person could not perform the jobs he previously described.  Dr. McGowan testified that even if the tremors did not occur every day, their uncontrollable nature would prevent the performance of such work.  (Tr. 738-39.)

B.    Hearing Held on July 11, 2012

1.    *Plaintiff's Testimony*

Plaintiff testified at the hearing on July 11, 2012, in response to questions posed by counsel.

Plaintiff testified that he has suffered from a seizure disorder for over twenty years and a tremor disorder since he was seventeen or eighteen years of age. Plaintiff testified that both conditions have worsened over time.  (Tr. 745.)

Plaintiff testified that he has injured himself during his seizures because he is "out cold" and falls to the floor.  (Tr. 747-48.)  Plaintiff testified that his body flops like a fish out of water and he usually urinates on himself during a seizure.

Plaintiff testified that his seizures have also caused him to experience memory loss. (Tr. 749-50.) Plaintiff testified that an additional medication has been added to his treatment regimen for seizures and that he has not had a seizure for about three or three and a half months. (Tr. 746-47.)

Plaintiff testified that he is not allowed to drive and must do everything with assistance, including bathing and cooking. Plaintiff testified that he was let go from previous jobs because of his seizure activity. (Tr. 748-49.)

2. *Testimony of Medical Expert*

Dr. Mark Farber, an internist who is board certified in pulmonary diseases, testified at the hearing in response to questions posed by the ALJ and counsel.

Dr. Farber testified that the medical record showed plaintiff to have a history of hepatitis C for which he previously received treatment. Plaintiff was noted to also have essential tremor since age seventeen or eighteen, which was currently well controlled on Primidone and did not interfere with his daily activities. Dr. Farber testified that the record also showed plaintiff to have post-traumatic seizure disorder but that he had not had any seizures since beginning Keppra in April 2012. Dr. Farber noted the record to show that plaintiff was sometimes unable to afford his medication. Dr. Farber testified that the record showed that plaintiff did not have any seizures as long as he took his prescribed medication, especially Keppra. (Tr. 752-53.)

Dr. Farber testified that none of plaintiff's impairments individually meet or equal any listed impairment, noting that there is no listed impairment for seizures. Dr. Farber opined that, as long as plaintiff takes the right medication, his seizures should not interfere with his ability to work "except for certain restrictions or seizure precautions in the workplace that would have to be observed." (Tr. 753.) Dr. Farber opined that plaintiff would have no physical limitations but should avoid extreme heat and cold, stress, unprotected heights, moving machinery, and driving. Dr. Farber also opined that plaintiff should never be exposed to ropes or ladders. (Tr. 754.)

In response to counsel's questions, Dr. Farber testified that, while it was possible that plaintiff could have an occasional seizure even with medication, such circumstance would not necessarily preclude him from being able to work, especially if plaintiff were not permitted to be in a work setting where he would be harmed if he had a seizure. (Tr. 754-55.) Dr. Farber testified to his experience that some persons with seizure disorders work every day and do not have restrictions placed on them that would prevent them from working. Dr. Farber testified that if plaintiff's doctors felt that work-limiting restrictions were necessary, they should say so. (Tr. 757-59.)

Dr. Farber also testified that, as with the six-month driving restriction, the bathing restriction would likewise be lifted after six months of being seizure-free.

Dr. Farber acknowledged that the record did not show plaintiff's doctors to impose a bathing restriction for only six months, but testified that the limited duration of this restriction is "the standard."  (Tr. 755.)

3.    *Testimony of Vocational Expert*

Joy Yoshioka, a vocational expert, testified at the hearing in response to questions posed by the ALJ and counsel.

Ms. Yoshioka classified plaintiff's past work as a security guard as light with an SVP level of 3; as a telephone solicitor as sedentary with an SVP level of 3; as a construction worker as very heavy with an SVP level of 2; and as a hand packager as medium with an SVP level of 2.  (Tr. 762.)

The ALJ asked Ms. Yoshioka to consider a fifty-two-year-old individual with an education beyond high school and plaintiff's past relevant work.  The ALJ asked Ms. Yoshioka to assume the individual could perform light work defined as lifting, carrying, pushing, and pulling twenty pounds occasionally and ten pounds frequently; and being able to sit, stand, and walk each for six hours out of an eight-hour workday.  The ALJ asked Ms. Yoshioka to further assume that the person could have no contact with ladders, scaffolds, moving machinery, unprotected heights, or extreme cold or heat.  Ms. Yoshioka testified that such a person could perform plaintiff's past work as a security guard, of which 5,000 such jobs exist in the State of Missouri and 300,000 nationally.  (Tr. 762-73.)  Ms. Yoshioka testified

that such a person could also perform other work such as a cleaner, of which 16,000 such jobs exist in the State of Missouri and 800,000 nationally; and laundry worker, of which 12,000 such jobs exist in the State of Missouri and 50,000 nationally.  (Tr. 763-64.)

In response to counsel's questions, Ms. Yoshioka agreed that a person with essential tremors and seizures who may find themselves in a stressful situation would have a problem doing security work.  (Tr. 764.)  Ms. Yoshioka also testified that competitive employment would be precluded for a person who unpredictably experiences seizures that last for fifteen minutes and render the person unable to work for two or three days thereafter.  (Tr. 768-69.)

### III.  Medical Evidence Before the ALJ

Plaintiff underwent an MRI of the brain on March 29, 2002, in response to his complaints of seizures.  The MRI was negative and showed no major interval change since a study performed in August 1997.  (Tr. 546.)

In January 2004, plaintiff underwent CT scans of the paranasal sinus for evaluation of pneumatized anterior clinoid process in relation to his diagnosed epilepsy condition.  Mild chronic inflammatory mucosal thickening was noted as well as tiny mucous retention cysts.  (Tr. 560-62.)

In June 2005, plaintiff went to the emergency room at Southeast Missouri (SEMO) Hospital with complaints relating to a broken right foot.  Physical

examination showed plaintiff's other extremities to be stable, with neurological examination to show no abnormal movements.  (Tr. 572-73.)

On January 2, 2008, plaintiff underwent a consultative neurologic consultation for disability determinations.  Plaintiff reported a history of tremors so severe that he could not type, but that taking Xanax seemed to control the tremor. Plaintiff reported the tremor not to interfere with his daily activities.  Plaintiff reported a ten-year history of seizures, but that he had not had a seizure in three years.  Plaintiff was noted to be taking Dilantin (Phenytoin) for the condition. Plaintiff was also noted to be taking Atenolol.  Plaintiff reported having worked for a number of years and that he left his last job in December 2007 because he did not have the energy to work twelve-hour shifts.  Plaintiff reported living alone and that he could perform his own house care.  Plaintiff reported having decreased energy. Physical examination was unremarkable except for very fine tremor of both hands. Dr. Steven Mellies diagnosed plaintiff with essential tremor, under good control with Xanax; seizures, under good control with anticonvulsant; and hepatitis C.  Dr. Mellies reported that plaintiff did not demonstrate any significant neurological deficits on exam.  (Tr. 594-95.)

Plaintiff was admitted to the emergency room at SEMO Hospital on April 29, 2008, upon having a seizure.  Plaintiff was given Dilantin and Toradol and had no further seizure activity.  It was noted that plaintiff had poor medication

compliance, and plaintiff reported that he would fill his Dilantin prescription. Plaintiff was discharged to home with instruction to have family members stay with him that night. Plaintiff was also instructed not to drive until he saw his physicians. (Tr. 575.)

Plaintiff was admitted to the emergency room on June 5, 2010, with complaints of weakness, fatigue, and seizure activity. Plaintiff also complained of having tremors, and it was questioned whether plaintiff was dehydrated. It was noted that plaintiff had been found the previous day after living on the streets for two to three weeks. Plaintiff reported having last had a seizure the previous week and that he had not been taking his medication. It was noted that plaintiff had run out of Xanax, which he was taking for tremors. Plaintiff's history of hepatitis C, seizures, and tremors was noted. Neurological examination showed generalized tremors but was otherwise normal. Plaintiff was prescribed Dilantin and Xanax and was discharged to home. Plaintiff was instructed not to drive home. Plaintiff's discharge diagnoses were chronic seizure disorder and familial tremor. (Tr. 578-88.)

Plaintiff visited Dr. Mark Kasten on June 10, 2010, for medication management. Dr. Kasten noted plaintiff to be taking Xanax and Dilantin. Dr. Kasten instructed plaintiff to see Dr. Mellies for evaluation. (Tr. 600.)

Plaintiff visited Dr. Mellies on June 29, 2010, for a neurological evaluation.

Plaintiff complained of seizures and tremors and expressed concern regarding his memory. Plaintiff reported to Dr. Mellies that he had had a recurrence of seizures since his January 2008 evaluation and that he recently had a seizure three weeks prior as well as one month prior to that. Plaintiff reported that he lost several jobs because of seizures, including his last job in May 2010. Plaintiff reported that he did not drive. Plaintiff reported that he currently took Dilantin, and Dr. Mellies noted that Dilantin was not detected in plaintiff's system at his most recent emergency room visit. Plaintiff's friend reported to Dr. Mellies that she had witnessed bruises on plaintiff's face. Plaintiff reported that he takes Xanax for tremors with some benefit, but had been out of the medication for four days. Plaintiff also reported having memory problems, and plaintiff's friends reported to Dr. Mellies that they had noticed plaintiff to have short-term memory problems for several months. Dr. Mellies noted plaintiff to live alone, receive Meals on Wheels, and needed to be taken to the grocery store. Plaintiff reported doing only a little bit of cooking. Physical examination was unremarkable, except for very fine rapid tremor, which was particularly noticed when the hands were outstretched. Dr. Mellies diagnosed plaintiff with essential tremor; seizures with loss of consciousness, subtherapeutic or noncompliant with Dilantin; and memory concern, with a need to be examined further. Dr. Mellies instructed plaintiff to increase his Dilantin and to take the medication on a regular basis. Dr. Mellies

gave plaintiff a trial of Primidone and determined not to restart Xanax.  (Tr. 596-97.)  An MRI of the brain taken that same date showed no convincing evidence of mesial temporal sclerosis; no evidence of acute infarct; mild diffuse cerebral and cerebellar volume loss; and minor scattered ethmoid, left frontal and left sphenoid sinus mucosal thickening.  (Tr. 591.)

Plaintiff underwent hernia repair on July 7, 2010.  (Tr. 627-28.)  During pre-operative examination, plaintiff complained of fatigue, muscle weakness, seizures with convulsions, anxiety, and depression.  Plaintiff reported that he "could walk forever" but not at all with the pain from the hernia.  Plaintiff's current medications were Phenytoin, Xanax, and an antibiotic.  (Tr. 613-16.)

Plaintiff returned to Dr. Kasten on July 14, 2010, and asked to be restarted on Xanax for anxiety.  Plaintiff reported that Primidone helped with tremor but not with anxiety.  Physical examination showed tremor to be present but was otherwise unremarkable.  Dr. Kasten prescribed Klonopin for plaintiff.  (Tr. 601-02.)

On July 20, 2010, plaintiff reported to Dr. Mellies that he had not had any seizures with the increased level of Dilantin and that his tremors were better with Primidone.  Dr. Mellies determined that plaintiff was doing well and no change was made to plaintiff's treatment regimen.  (Tr. 598.)

Plaintiff visited Dr. Robert W. George on August 9, 2010, to establish care.  It was noted that plaintiff had been treated for tremors and anxiety by Dr. Nemeth

in St. Louis.  Plaintiff was noted to be taking Xanax.  Dr. George diagnosed plaintiff with seizure disorder.  (Tr. 607.)

On August 16, 2010, plaintiff reported to Dr. Kasten that his symptoms had not changed since beginning Klonopin.  Dr. Kasten continued plaintiff on the medication.  (Tr. 604.)

Plaintiff returned to Dr. George on September 16, 2010, who refilled plaintiff's Xanax for anxiety.  No new complaints were noted.  (Tr. 608.)  Dr. George refilled plaintiff's Xanax again in October and November.  (Tr. 610-11.)

Plaintiff went to SEMO Hospital on October 15, 2010, with complaints of diarrhea, nausea, and numbness in his legs.  Plaintiff's current medications included Phenytoin, Primidone, Xanax, and Zofran.  Dr. Andrew Godbey, a neurologist, noted the recent increase in plaintiff's Phenytoin dosage and determined the numbness to be secondary to Phenytoin toxicity.  Plaintiff was admitted so that the medication could be reduced to a therapeutic level, and Dr. Mellies was to be contacted regarding plaintiff's antiepileptic regimen.  (Tr. 645-49.)

Plaintiff visited Dr. Godbey on November 3, 2010, for follow up.  Plaintiff was noted to be trembling.  Dr. Godbey noted that plaintiff was placed on Keppra prior to discharge from his recent hospitalization, and plaintiff reported a lessening of numbness in his legs and no seizures since discharge.  No new complaints were

noted. Physical and psychiatric examinations were unremarkable. Dr. Godbey determined to taper plaintiff from Phenytoin and to continue him on Keppra. Dr. Godbey also considered switching plaintiff to another medication for tremor given his complaints of poor memory and concentration. Ambien was prescribed for sleep. Plaintiff was diagnosed with generalized convulsive epilepsy (severe, worsening), benign essential tremor, and insomnia. Plaintiff was instructed to avoid bathing unattended, avoid swimming unattended, avoid driving, and not to cook alone. Plaintiff was instructed to return in two months. (Tr. 656-58.)

On December 15, 2010, Dr. Jean Diemer, a medical consultant with disability determinations, completed a Physical RFC Assessment in which she opined that plaintiff could occasionally lift twenty pounds and frequently lift ten pounds; could stand and/or walk about six hours in an eight-hour workday; could sit about six hours in an eight-hour workday; and was unlimited in his ability to push and/or pull other than his lifting limitations. Dr. Diemer opined that plaintiff should never climb ladders, ropes, or scaffolds; could occasionally climb ramps and stairs; and could frequently balance, stoop, kneel, crouch, and crawl. Dr. Diemer further opined that plaintiff should avoid concentrated exposure to hazards, such as machinery and heights, but otherwise had no environmental limitations. Dr. Diemer opined that plaintiff had no manipulative, visual, or communicative limitations. Dr. Diemer reported the record to show that plaintiff's seizures were

well controlled with medication compliance and that plaintiff's tremors did not interfere with his ability to do fine fingering or handling. (Tr. 662-67.)

On December 17, 2010, Joan Singer, Ph.D., a psychological consultant with disability determinations, completed a Psychiatric Review Technique Form in which she opined that plaintiff had no medically determinable mental impairment. (Tr. 668-78.)

Plaintiff returned to Dr. Godbey on February 1, 2011, and reported having had two general tonic clonic seizures since his last visit with oral trauma but no urine incontinence. Plaintiff reported not having missed any doses of Keppra. Plaintiff reported having no irritability, nausea, or vomiting with the medication but that he has been waking up with full body soreness. Plaintiff reported having chronic nausea with Primidone and that he has difficulty staying asleep. Plaintiff also complained of tremor. Physical examination was normal except for mild postural tremor. Given plaintiff's continued seizures while on Keppra, Dr. Godbey determine to increase plaintiff's dosage of the medication. Dr. Godbey discussed with plaintiff seizure precautions, including no driving and avoiding situations where he can harm himself or others in the event of a seizure. Dr. Godbey specifically instructed plaintiff to avoid bathing unattended, avoid driving for a period of six months from the date of his last seizure, avoid swimming unattended, avoid ladders, and to call with any new seizures. Dr. Godbey determined to treat

plaintiff's tremor with a different medication once the seizures were under control. Plaintiff was instructed to increase his dosage of Ambien. Dr. Godbey diagnosed plaintiff with general convulsive epilepsy (improving) and tremor. (Tr. 659-61.)

Plaintiff visited Dr. Godbey on November 10, 2011, and reported continued generalized tonic clonic seizures, with his most recent seizure occurring one and a half months prior. Plaintiff reported waking up with oral trauma and facial bruising. Plaintiff reported that he had seizures approximately once every one to two months but did not call and report them because he could not afford an office visit. Plaintiff reported having had to stop Keppra because of its cost and that he restarted Phenytoin. Dr. Godbey noted plaintiff not to be driving. Plaintiff's current medications included Primidone, Ambien, Dilantin, and Klonopin. Physical examination showed mild postural tremor but was otherwise unremarkable. Dr. Godbey prescribed Lacosemide and provided plaintiff a voucher for a fourteen-day free trial of the medication. Dr. Godbey expressed hope that plaintiff would soon have insurance coverage after disability review at which time he could continue on the medication. Seizure precautions were discussed, and plaintiff was instructed not to drive and to avoid situations where he could harm himself or others if he were to have a seizure. Dr. Godbey determined to continue plaintiff on Primidone for tremor but to wean him from the medication once the seizures were controlled, given plaintiff's complaints of poor

concentration. Dr. Godbey diagnosed plaintiff with generalized convulsive epilepsy (severe, worsening) and tremor (mild, improving). Plaintiff was instructed to return in two months. (Tr. 686-88.)

Plaintiff returned to Dr. Godbey on April 18, 2012, and reported that he continued to experience generalized tonic clonic seizures once a month with oral trauma. Plaintiff reported his last seizure to have occurred three weeks prior. It was noted that plaintiff had been placed on Keppra previously but could not afford the medication. Dr. Godbey noted plaintiff to be homeless and living in a hotel, and that friends and family were helping him apply for Medicaid. Plaintiff was currently taking Phenytoin, Primidone, and Ambien. Examination showed mild postural tremor, psychomotor retardation, and a flat affect. Dr. Godbey noted plaintiff's seizures to be poorly controlled on Phenytoin. Plaintiff's friends agreed to pay for Keppra until plaintiff obtained Medicaid coverage. Dr. Godbey noted that Keppra would be continued if plaintiff obtained Medicaid and disability, but Lacosamine would be considered because of its lower cost with Medicaid. Dr. Godbey continued plaintiff on Phenytoin with the potential for weaning if Keppra controlled the seizures. Dr. Godbey determined not to discontinue Primidone given that the medication also helps with seizures, which were currently poorly controlled. Dr. Godbey diagnosed plaintiff with generalized convulsive epilepsy (severe) and tremor (mild). Plaintiff was instructed to avoid bathing unattended,

avoid driving for a period of six months from the date of the last seizure, avoid swimming unattended, avoid ladders, and call if he had any new seizures. Plaintiff was instructed to follow up in three months. (Tr. 691-93.)

Plaintiff returned to Dr. Godbey on June 21, 2012, and reported that he had not had any seizures since the last visit and that he continued to take Keppra and Phenytoin. Plaintiff also reported his tremor to be well controlled with Primidone with no interference in his daily activities. Plaintiff reported a significant worsening of his tremor if he misses a dose of Primidone. Examination showed very mild postural tremor and psychomotor retardation but was otherwise unremarkable. Dr. Godbey concluded that plaintiff's generalized tonic clonic seizures and tremors were controlled with medication. Dr. Godbey determined for plaintiff to continue with Keppra and Phenytoin. Plaintiff was to continue with Primidone for tremor, but it was noted that the medication may be switched if plaintiff experienced worsening depression or lethargy. Plaintiff was diagnosed with generalized convulsive epilepsy (improving) and tremor (mild) and was instructed to return in three months. Precautionary measures for seizures remained in place. (Tr. 694-96.)

### IV. Other Third Party Evidence Before the ALJ

On June 7, 2010, Claudia Weaver, an SSA employee, conducted a face-to-face interview of plaintiff for purposes of completing a Disability Field Office

Report.  Plaintiff's sister and ex-wife accompanied plaintiff to the interview.  (Tr. 373-77.)  Ms. Weaver noted plaintiff to have difficulty understanding and concentrating and specifically observed that plaintiff "[n]eeded help remembering things that had happened.  Could not remember at first that he had minor children when asked until family reminded him."  (Tr. 376.)

On August 23, 2010, plaintiff went to the SSA office with his ex-wife to complete paperwork, and he was again interviewed by Ms. Weaver.  (Tr. 395-408.) Ms. Weaver continued to note plaintiff to have difficulty with understanding and concentrating.  Ms. Weaver specifically observed that plaintiff "[h]ad difficulty understanding some of the things being discussed and former spouse or interviewer would have to try and explain things more than once."  (Tr. 396.)

On August 30, 2010, Ms. Finnegan completed an Adult Function Report on behalf of plaintiff for disability determinations.  (Tr. 420-27.)  Ms. Finnegan completed the form because plaintiff did not understand it.  In this form, Ms. Finnegan reported that plaintiff needed reminders to take medicine, eat, go to doctors' appointments, change clothes, and shower.  It was reported that plaintiff was unable to pay bills, handle a savings account, or use a checkbook because he "can't remember to pay bills or even when they are due.  Family takes care of paying them.  Can't balance checkbook anymore, forgets how.  Family writes them out and he signs."  (Tr. 421.)  Ms. Finnegan further reported that plaintiff had "no

concept of how much is in account, does not mentally understand it is not available if not in [account]." (Tr. 422.) Ms. Finnegan reported that plaintiff needed to be reminded to go places and that he needed someone to accompany him. Ms. Finnegan reported that plaintiff does not handle changes in routine well because he cannot remember when change occurs or why, and he needs the reasons for any change to be continually repeated to him. (Tr. 422-23.) Ms. Finnegan concluded:

> Greg's mind & memory are very short. A family member calls to check on him 3 times a day. He forgets to take medicine, shower and doesn't change clothes unless he is reminded. . . . We all take turns taking him to grocery store or doctors appointments after reminding him. . . . He needs help with understanding the need to pay bills and doesn't understand paperwork. He forgets to check his mail.

> He has "Meals on Wheels" delivered every day except Saturday & Sunday[.] . . . . When we ask him to go to the grocery store, he says he doesn't need to go. When his kids check to see if he has any, he doesn't. He has someone escort him to every doctors [appointment] because he can't remember what they tell him.

(Tr. 424.)

On November 3, 2010, SSA employee Deborah McWilliams spoke with plaintiff by telephone. Plaintiff provided an updated status regarding his doctors and his appointments with them. Ms. McWilliams noted plaintiff to have "no problems recalling the names of his physicians or the times seen." (Tr. 428.)

## V. The ALJ's Decision

The ALJ found that plaintiff met the insured status requirements of the Social Security Act through September 30, 2014. The ALJ found plaintiff not to

have engaged in substantial gainful activity since January 1, 2009, the alleged onset date of disability. The ALJ found that plaintiff's seizure disorder and essential tremors were severe impairments, but that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 26-27.) The ALJ found plaintiff to have the RFC to perform light work as defined in the Regulations,[1]

> except that [he] can sit for six of eight hours per day; stand and walk for six of eight hours per day; can lift 20 pounds occasionally and ten pounds frequently and must avoid all exposure to hazards such as moving machinery, unprotected heights or use of ladders, ropes or scaffolds.

(Tr. 27.) The ALJ found plaintiff able to perform his past relevant work as a security guard. Alternatively, the ALJ determined that vocational expert testimony supported a finding that with his age, education, work experience, and RFC, plaintiff could perform other work as it exists in significant numbers in the national economy, and specifically, cleaner and laundry worker. The ALJ thus found plaintiff not to be under a disability from January 1, 2009, through the date of the decision. (Tr. 29-31.)

---

[1] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. . . . [A] job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b).

# VI.  Discussion

To be eligible for DIB under the Social Security Act, plaintiff must prove that he is disabled.  *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *Baker v. Secretary of Health & Human Servs.,* 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process.  *See* 20 C.F.R. § 404.1520; *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity.  If the claimant is working, disability benefits are denied.  Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits his ability to do basic work activities.  If the claimant's

impairment(s) is not severe, then he is not disabled. The Commissioner then determines whether claimant's impairment(s) meets or equals one of the impairments listed in 20 C.F.R., Part 404, Subpart P, Appendix 1. If claimant's impairment(s) is equivalent to one of the listed impairments, he is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform his past relevant work. If so, the claimant is not disabled. Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001). This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings." *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted). "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis." *Id.* (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1.      The credibility findings made by the ALJ.

2.      The plaintiff's vocational factors.

3.      The medical evidence from treating and consulting physicians.

4.      The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.      Any corroboration by third parties of the plaintiff's impairments.

6.      The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.,* 957 F.2d 581, 585-86 (8th Cir. 1992) (internal citations omitted).  The Court must also consider any evidence which fairly detracts from the Commissioner's decision.  *Coleman*, 498 F.3d at 770; *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999).  "If, after reviewing the entire record, it is possible to draw two inconsistent positions, and the Commissioner has adopted one of those positions," the Commissioner's decision must be affirmed.  *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012).  The decision may not be reversed merely because substantial evidence could also support a contrary outcome.  *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

A review of the record as a whole shows there to be substantial evidence that plaintiff experiences significant problems with concentration, memory, and comprehension, but the ALJ wholly failed to acknowledge this evidence and thus failed to consider the extent to which plaintiff may experience limitations in his ability to perform the mental requirements of work. Because the ALJ failed to consider this evidence and failed to undergo the required analysis in determining the severity of this mental impairment, the matter will be remanded for further proceedings

In the Commissioner's first decision finding plaintiff disabled, the ALJ noted that psychological testing showed plaintiff to be somewhat slow at times in his ability to function and answer questions, especially in the area of immediate recall. (Tr. 199.) Subsequent medical records submitted to the SSA for continuing disability review show plaintiff to complain of decreased memory and concentration (*e.g.,* Tr. 515, 517); and in a Continuing Disability Report completed after plaintiff's emergency room visit in June 2010, plaintiff reported having memory loss and difficulties remembering to take medication, understanding and following directions, and completing tasks (Tr. 359-72). Indeed, SSA employee Claudia Weaver personally observed in June and August 2010 that plaintiff had difficulty with understanding and concentration; needed help remembering things, including that he had minor children; and had difficulty understanding some of the

things being discussed, requiring repeated explanations. Plaintiff testified at both hearings that he had poor memory and concentration, and Ms. Finnegan testified extensively at the November 2011 hearing regarding plaintiff's memory loss, providing examples and details as to the effects of such memory loss.

Plaintiff also repeatedly complained to his healthcare providers that he experienced memory loss and poor concentration, leading to recommendations for further evaluation and consideration of medication changes. In June 2010, plaintiff reported to Dr. Mellies that he was concerned regarding his memory loss, with such concern echoed by plaintiff's friends who had accompanied him to this appointment. Dr. Mellies noted that plaintiff's memory problems needed further evaluation, but the record does not show any such evaluation to have been performed. Upon beginning treatment with Dr. Godbey in November 2010, plaintiff continued to complain of memory loss and poor concentration, prompting Dr. Godbey to consider changing plaintiff's tremor medication. Notably, no change was made and plaintiff continued to complain of poor concentration and memory.

Finally, a review of the Adult Function Report completed by Ms. Finnegan is consistent with the other evidence of record set out above and provides great detail regarding plaintiff's memory impairment and its limiting effect on plaintiff's daily activities and functional abilities.

Despite this significant and consistent evidence of plaintiff's limitations in memory, concentration, and comprehension, the ALJ wholly failed to consider such evidence in his written decision. Nor did the ALJ discount plaintiff's complaints of memory loss and poor concentration. Instead, the ALJ dismissively addressed plaintiff's "anxiety" at Step 2 of the sequential analysis, finding it not to be a severe impairment because of a lack of diagnosis (*see* Tr. 27); and, in his RFC determination, he accorded great weight to a non-examining State agency consultant's finding that plaintiff had no medically determinable mental impairment, again noting there to be no diagnosis of "anxiety" (*see* Tr. 29). The record shows, however, that plaintiff experienced mental limitations beyond those that could be associated with anxiety and, indeed, that such limitations were related to the effects of his post-traumatic seizure disorder, medication, or both. Regardless, the ALJ's wholesale failure to consider this substantial evidence of plaintiff's mental limitations in memory, concentration, and comprehension was error, with such error likely affecting the ALJ's RFC assessment. *See Cunningham v. Apfel*, 222 F.3d 496, 501-02 (8th Cir. 2000); *see also Cuthrell v. Astrue*, 702 F.3d 1114 (8th Cir. 2013) (symptoms characteristic of mental impairment caused by traumatic brain injury include memory impairment and difficulties in maintaining concentration, persistence, or pace). *Cf. Garza v. Barnhart*, 397 F.3d 1087, 1089 (8th Cir. 2005) (misunderstanding of impairment and failure to find it

to be severe may affect RFC findings); *Moore v. Astrue*, No. 4:11-CV-1873-SPM, 2013 WL 781803 (E.D. Mo. Mar. 1, 2013) (ALJ discussed seizure disorder at length but did not adequately consider evidence of mental impairment, resulting in faulty RFC). While an ALJ is not required to explain all the evidence of record, *Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010), he nevertheless cannot merely "pick and [choose] only evidence in the record buttressing his conclusion." *Taylor o/b/o McKinnies v. Barnhart*, 333 F. Supp. 2d 846, 856 (E.D. Mo. 2004), and cases cited therein.

This matter will therefore be remanded to the Commissioner for further consideration of plaintiff's demonstrated mental impairment. Upon remand, the ALJ shall document in his written decision his application of the psychiatric review technique as required by 20 C.F.R. § 404.1520a when determining the severity of plaintiff's mental impairment, and specifically rate the degree of functional loss plaintiff suffers as a result of the impairment in the areas of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. Should the medical record require additional development in order for the ALJ to make a proper assessment, it is the ALJ's duty to develop the record by directing interrogatories to plaintiff's physicians or by ordering consultative examinations. *See Bishop v. Sullivan*, 900 F.2d 1259, 1263 (8th Cir. 1990); 20 C.F.R. § 404.1517.

Upon remand, the ALJ shall also re-evaluate the extent to which plaintiff's essential tremor affects his ability to perform basic work activities. Although the ALJ determined in his RFC analysis that there was "no evidence presented at any time that suggested that the tremors were limiting to the claimant's ability to perform basic self-care or work activities" (Tr. 29), he previously found at Step 2 of the sequential analysis that plaintiff's essential tremor was a severe impairment, stating that it resulted "in more than a minimal interference with basic work activities." (Tr. 26.) Notably, in order to be found "severe" at Step 2, the impairment must "significantly limit [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a). Given the ALJ's incongruous findings regarding the extent to which plaintiff's essential tremor affects his ability to perform work activities, this Court would be required to reweigh the evidence, review the factual record *de novo*, or engage in speculation to determine the basis on which the ALJ ultimately denied plaintiff's claim. This the Court cannot do. *See Smith v. Colvin*, 756 F.3d 621, 626 (8th Cir. 2014); *Collins v. Astrue*, 648 F.3d 869, 872 (8th Cir. 2011).

Accordingly, this matter will be remanded to the Commissioner with instruction to more fully evaluate the record with respect to plaintiff's mental impairment and engage in the proper analysis in determining the extent to which plaintiff's limitations in memory, concentration, and comprehension affect his

functional ability to perform work-related activities. In determining plaintiff's RFC upon remand, the Commissioner is reminded that consideration must be given to the limitations and restrictions imposed by *all* of the plaintiff's medically determinable impairments, both severe and non-severe, as well as limitations imposed by medication side effects. *Ford v. Astrue,* 518 F.3d 979, 981 (8th Cir.2008) (citing 20 C.F.R. § 404.1545(a)) (severe and non-severe impairments must be considered); *Cunningham*, 222 F.3d at 501 (ALJ obligated to consider combined effects of impairments); *cf. Vincent v. Apfel*, 264 F.3d 767, 769 (8th Cir. 2001) (RFC findings failed to account for medication side effects). The parties shall be allowed to supplement the record with any additional information that may assist the ALJ in making these determinations. In addition, the Commissioner is encouraged upon remand to obtain medical evidence that addresses plaintiff's ability to function in the workplace, which may include contacting plaintiff's treating physician(s) to clarify his limitations and restrictions in order to ascertain what level of work, if any, he is able to perform. *Coleman v. Astrue,* 498 F.3d 767 (8th Cir. 2007); *Smith v. Barnhart*, 435 F.3d 926, 930-31 (8th Cir. 2006). In the absence of such evidence from plaintiff's own medical sources, the Commissioner is encouraged to order a consultative examination(s) to obtain such medical evidence. 20 C.F.R. § 404.1517.

## VII. Conclusion

Therefore, for all of the foregoing reasons, the Commissioner's adverse decision is not based upon substantial evidence on the record as a whole and the matter shall be remanded to the Commissioner for further proceedings consistent with this opinion.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **REVERSED**, and this case is **REMANDED** to the Commissioner for further proceedings.

A separate Judgment in accordance with this Memorandum and Order is entered this same date.

Dated this __13th__ day of March, 2015.

_____/s/Terry I. Adelman_____
UNITED STATES MAGISTRATE JUDGE